IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHERRI SABO, | ) | CASE NO. 5:12CV2510 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL, | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Sherri Sabo ("Plaintiff" or "Sabo") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for supplemental social security income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I. Procedural History

Sabo protectively filed[2] an application for SSI on May 27, 2009, alleging a disability onset date of October 1, 2006.  Tr. 30, 138.  She alleged disability based on bipolar disorder.  Tr. 150.  After denials by the state agency initially and on reconsideration (Tr. 99-101, 107-113),

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Protective filing is a Social Security term for the first time you contact the Social Security Administration to file a claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date than the actual signed application date. This is important because protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents. http://www.ssdrc.com/disabilityquestionsmain20.html (Last visited 3/05/14).

Sabo requested a hearing. Tr. 114-116. A hearing was held before Administrative Law Judge ("ALJ") James A. Hill on June 22, 2011. Tr. 45-82.

In his July 12, 2011, decision, the ALJ determined that Plaintiff's residual functional capacity ("RFC") did not prevent her from performing work existing in significant numbers in the national economy, i.e., she was not disabled. Tr. 27-44. Sabo requested review of the ALJ's decision by the Appeals Council. Tr. 12. In October and November 2011 and January 2012, Sabo submitted additional medical evidence to the Appeals Council for review. Tr. 374-489. On August 28, 2012, the Appeals Council denied Sabo's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A. Personal and Vocational Evidence

At the time Sabo filed her application, she was a 48 year old female, which is defined as a "younger individual age 18-49" by the Social Security Administration. Tr. 38. However, Sabo turned 50 years old by the time of the ALJ's decision, which is defined as a person "closely approaching advanced age." Id. Sabo earned a GED. Tr. 51. The ALJ determined that Sabo has no past relevant work. Tr. 38, 159.

### B. Medical Evidence – Physical Impairments

#### 1. Treating Professionals

On October 28, 2010, Sabo underwent a series of x-rays on her back and knees at Humility of Mary Health Partners ("HMHP"). Tr. 335-343. The x-rays of her knees were entirely normal. Tr. 339. The x-ray of her spine revealed degenerative disc disease of the lumbar spine. Tr. 335.

On May 18, 2011, Sabo sustained a fracture to her right patella.  Tr. 361-365.  Sabo indicated that she injured her knee two weeks prior getting out of a car.  Tr. 362.  Dr. Michael Pryce, M.D. advised Sabo to wear a knee immobilizer and told her to return to his office in six weeks.  Tr. 365.

### 2. State Agency Opinions

Sabo underwent a consultative examination with Dr. Mary-Helene Massullo on October 12, 2009.  Tr. 318-328.   Dr. Massullo opined that Sabo had no limitations in sitting, standing, walking, carrying, handling objects, hearing, and speaking.  Tr. 35.  Anton Freihofner, M.D., state agency consultant, opined on December 4, 2009, that Sabo had no severe physical impairments.  Tr. 329.  On May 12, 2010, Willa Caldwell, M.D., affirmed Dr. Freihofner's opinion.  Tr. 334.

## C. Medical Evidence – Mental Impairments

### 1. Treating Professionals

Sabo treated with Dr. Ehab Sargious, M.D., of Specialty Care Counseling from March 21, 2008, through July 21, 2010.  Tr. 285-293, 366-373.  On March 21, 2008, Dr. Sargious diagnosed Sabo with Bipolar Disorder and Dependent Personality Traits.  Tr. 292.  Dr. Sargious reported that Sabo cried during the entire interview but that her insight and judgment were fair. Tr. 292.  Sabo was referred to counseling and prescribed Seroquel, Lorazepam, and Celexa.  Tr. 292-93.

On April 18, 2008, Sabo returned to Dr. Sargious reporting that the medication was helping and she was doing considerably well.  Tr. 290.  Sabo stated that she saw the counselor one time but missed the last couple of appointments.  Tr. 290.  Sabo also told Dr. Sargious that she found a job but ended up quitting because her employer was taking advantage of her and

requiring a lot of hours.  Tr. 290.  On May 16, 2008, Dr. Sargious again reported that Sabo was doing "considerably well" and started her on Ativan. Tr. 289.  On June 13, 2008, Sabo returned to Dr. Sargious with her mother.  Tr. 288.  Sabo indicated she was having a rough time with treatment and difficulty going to her counseling appointment.  Tr. 288.  Dr. Sargious stated, "I don't see [Sabo] capable of maintaining any long term employment.  She hardly made it for a few days for the last few years."  Tr. 288.

On June 20, 2008, an intake assessment of Sabo's mental health was conducted by Patricia Boldt, Licensed Social Worker with Coleman Professional.  Tr. 242-253.  Sabo was diagnosed with depressive and anxiety disorders.  Tr. 252.  There are no other records from Coleman Professional.  The next month Sabo presented to Psycare for a mental status evaluation but was only seen one time.  Tr. 255-260.

On November 19, 2008, Sabo returned to Dr. Sargious and indicated that she "wants her Ativan back;" however, he discontinued Ativan stating that "she has been using it as a band-aid" and her ex-boyfriend[3] has been stealing it.  Tr. 287.  Dr. Sargious also stated that Sabo has been taking one Lithium a day instead of two and should take both as prescribed.  Id.  On December 17, 2008, Dr. Sargious stated that Sabo is doing "much better" and was even driving again.  Tr. 286.  He further stated that, "[t]he Lithium seems to work.  She has been taking the full dose like she should."  Id.

On February 11, 2009, Sabo returned to Dr. Sargious and again requested her Ativan back saying that she was still struggling with anxiety and depression.  Tr. 285.  Dr. Sargious stated he would not give her the Ativan anymore because her ex-boyfriend stole it from her and abused it.  Tr. 285.  On June 3, 2009, Sabo presented to Dr. Sargious and reported she was still

---

[3] Dr. Sargious stated Plaintiff's ex-husband stole the Ativan, but Sabo has never been married.  Other medical reports refer to her ex-boyfriend.

struggling with depression and anxiety. Tr. 366. Dr. Sargious supplemented her treatment with Zoloft. Id. On August 5, 2009, Sabo informed Dr. Sargious that she had surgery to remove her ovaries and uterus and was experiencing menopausal syndrome. Tr. 367. Sabo continued to report some anxiety and depression. Tr. 367. From October 2009 through January 2010, Sabo reported that she was still struggling with her mental health symptoms. Tr. 368-370. Dr. Sargious increased Sabo's Zoloft prescription. Tr. 370. Sabo also presented to Dr. Sargious in June and July 2010, reporting continued depression and anxiety. Tr. 371-73.

On February 24, 2011, Sabo was brought by EMS to the Emergency Department at Robinson Memorial Hospital. Tr. 345. Robinson Memorial reported that Sabo was found wandering around her boyfriend's apartment complex. Id. Apparently Sabo stated that she lived with her boyfriend and was locked out of their apartment but neighbors told the police that Sabo did not live there. Tr. 347. Sabo was found disoriented, with slurred speech, and was carrying a bag of medications. Tr. 351. Dr. Frank M. Kelley, M.D., stated that Sabo was doubling up on her lithium and was found to have lithium toxicity. Tr. 345. Dr. Kelly further stated,

> The patient also noted to have evidence of polysubstance abuse from her urine toxicology screen showing THC (Tetrahydrocannabinol), benzodiazepine, barbiturates, and acetaminophen. She does have a prescription of her son's for Fioricet and had a prescription of her mother's for Ativan that was noted on admission. She has been instructed to only take her own medications…

Id. 348.

### 2. State Agency Opinions

Sabo met with consultative examiner J. Joseph Konieczny, Ph.D., on September 14, 2009. Tr. 295-298. Dr. Konieczny opined that Sabo has no impairment in her ability to concentrate and attend to task or understand and follow directions. Tr. 298. Dr. Konieczny opined that

5

Sabo's ability to relate to others and deal with the general public is moderately impaired.  Tr. 298.

On September 26, 2009, Joan Williams, Ph.D., a state agency consultant, reviewed the records and opined that Sabo is able to relate to coworkers and supervisors on a superficial basis with minimal interaction with the general public.  Tr. 302.  Dr. Williams further found that Sabo is able to understand, remember, and concentrate on a variety of tasks and is able to withstand the stress and pressure of daily work that does not require strict deadlines or production quotas.  Tr. 302.  On May 1, 2009, Cindy Matyi, Ph.D., state agency consultant, affirmed the opinion of Dr. Williams except Dr. Matyi opined that Sabo's capacity for understanding, remembering, and carrying out detailed instructions and her ability to concentrate for extended periods are moderately restricted.  Tr. 333.

    D.  **Testimonial Evidence**

        1.       **Sabo Testimony**

At the administrative hearing, Sabo was represented by counsel and testified that she cannot work due to anxiety or panic attacks which cause her to miss days and that sometimes "the job descriptions it take me a little longer time to do them accurately."  Tr. 53-54.  Sabo testified that she missed work because she couldn't get out of bed because of fear.  Tr. 54.  She stated she has difficulty sleeping and takes Seroquel.  Tr. 58.  Sabo also testified that she has at least one panic attack every other day and sometimes more than five panic attacks in one day.  Tr. 59.  Sabo stated that she takes Lithium and Zoloft for her depression.  Tr. 67.  She also takes a thyroid and cholesterol medication.  Tr. 67.  Sabo indicated that she recently overdosed on Lithium.  Tr. 76-77.  She stated, "I don't know if I was, tried (sic) to kill myself or, or whatever.  But I'm not (INAUDIBLE) on taking my pills."  Tr. 76.

Sabo testified that daily she cooks, makes coffee, smokes cigarettes, does household chores, watches television, sits outside on nice days but does not shop and has no hobbies.  Tr. 58, 60, 69, 73.  She stated that she has no friends and only socializes with her son, her parents, and "a couple aunts."  Tr. 75.  As to her physical limitations, Sabo testified that she has arthritis in both her right knee and back due to previous fractures in both.  Tr. 54-55.  She stated that she could only walk a maximum of three blocks and then could not walk another three block distance for at least a month.  Tr. 65.

### 2. Vocational Expert's Testimony

Vocational Expert Barbara E. Burk ("VE"), testified at the hearing.  Tr. 30, 77-81.  The ALJ told the VE that Sabo has no past relevant work.  Tr. 78.  The ALJ then asked the VE to assume a hypothetical individual of Sabo's age, education, and work experience, who can perform medium work and who can understand, remember, and carry out simple instructions and perform simple, routine tasks.  The ALJ further asked the VE to assume this person requires a relatively stable work place with few changes in the work setting or work processes and a low stress work environment without strict quotas or high production demands who can tolerate superficial interaction with the public and occasional interaction with co-workers.  Tr. 78-79.  The ALJ asked whether there were jobs existing in the regional and national economy that such a hypothetical individual could perform.  Tr. 79.  The VE stated that the hypothetical individual could perform work as:  a housekeeper (3,400 regional jobs, 370,000 national jobs), day worker (3,00 regional jobs, 300,000 national jobs), and an automatic car wash attendant (600 regional jobs, 71,000 national jobs).  Tr. 79, 80.

The ALJ then changed the prior hypothetical by limiting the individual to light work with minimal interaction with the public and superficial contact with co-workers.  Tr. 80.  The ALJ

7

also added that the individual has severe deficiencies in her ability to maintain concentration and attention that would cause her to be off task at least twenty percent of the time and frequently be absent from work at least two times a month without acceptable reasons. Tr. 80-81. The VE stated there are no jobs for such a hypothetical individual. Tr. 81.

### E. "New Evidence" Submitted to Appeals Council

Plaintiff presented various medical records to the Appeals Council in October and November 2011 and January 2012. Tr. 374-489. The medical records contain evidence of appointments and exams which took place before and after the ALJ's July 12, 2011, decision. The records evidencing treatment prior to the ALJ's decision consist of notes from Dr. Sargious and Sabo's counselor Bonnie Bennett dated 3/21/2008 to 4/06/2011. Doc. 14, pp. 10-11; Tr. 427-481. The records show that Sabo engaged in counseling with Ms. Bennett from April 2008 through April 2011. Tr. 428-480. The records also show additional visits to Dr. Sargious in 2010 and 2011. The records from 2010 generally show that Sabo continued to report that she struggled with depression and anxiety. Tr. 434, 436, 438, 440. The medical evidence dated after the ALJ's decision includes: (a) an October 7, 2011 letter from Dr. Zachary F. Veres (Tr. 408); (b) an October 17, 2011 "Counselor's Evaluation Impairment Questionnaire" from counselor Bennett (Tr. 393-400); (c) an October 12, 2011 letter from Dr. Sargious (Tr. 489); and (d) an October 14, 2011 nerve conduction study (Tr. 483-487). Doc. 14, p. 10.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

8

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[4]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his July 12, 2011, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful employment since May 27, 2009, the application date.  Tr. 32.

2. The claimant has the following severe impairments:  fracture of the medial border of the right patella, bipolar disorder, anxiety disorder, and degenerative disc disease of the lumbar spine.  Tr. 32.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[5]  Tr. 33.

4. After careful consideration of the entire record, [the ALJ found] that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) except that she can understand, remember, and carry out simple instructions, and perform simple, routine tasks.  The claimant requires a relatively stable workplace with few changes in the work setting or work processes.  She requires a low stress work environment without strict quotas or high production demands.  She can tolerate superficial interaction with the public and relate on an occasionally (sic) basis with co-workers.  Tr. 35.

5. The claimant has no past relevant work.  Tr. 38.

6. The claimant…was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 38.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

7.        The claimant has at least a high school education and is able to communicate in English. Tr. 38.

8.        Transferability of job skills is not an issue because claimant does not have past relevant work. Tr. 39.

9.        Considering claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 39.

10.       The claimant has not been under a disability, as defined in the Social Security Act, since May 27, 2009, the date the application was filed. Tr. 39.

The ALJ's decision became the final decision of the Acting Commissioner when the Appeals Council denied Sabo's request for review on August 28, 2012. Tr. 1.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

Sabo argues that the Appeals Council committed substantial error when it failed to find that the evidence submitted after the ALJ's July 12, 2011, decision constituted new and material evidence. Doc. 14, p. 9, 12. Sabo also argues that the ALJ failed to properly assess her credibility. Doc. 14, p. 14.

### B.    Defendant's Arguments

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Sabo is not disabled. Doc. 15, p. 2.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

11

unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. Sabo's request for a sentence six remand is not warranted

Sabo has requested that this Court remand her case to the Commissioner for consideration of new and material evidence which she submitted to the Appeals Council. Doc. 14, pp. 9-14. Defendant argues that the evidence submitted is not new or material and that Plaintiff failed to provide a good cause explanation as to why the records were not submitted prior to the ALJ's decision. Doc. 15, pp. 11-13.

When an ALJ renders the final decision of the Secretary, additional evidence submitted to the Appeals Council before or after the Appeals Council denies review should be considered only for the purposes of a Sentence Six remand. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Under *Sentence Six of 42 U.S.C. § 405(g),* "[t]he court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Therefore, to warrant a Sentence Six remand, the party seeking remand must show: (1) "that the evidence at issue is both 'new' and 'material,' " and (2) "that there is 'good cause for the failure to incorporate such

12

evidence into the record in a prior proceeding.' " 42 U.S.C. § 405(g); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir.2006) *(quoting Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 174 (6th Cir.1994)); *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").

A claimant will meet his burden of showing that such evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir.2001) (citing *Sullivan v. Finkelstein,* 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). A claimant must also show that such evidence is "material" by demonstrating "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Foster,* 279 F.3d at 357 (citing *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir.1988)). A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. *Foster,* 279 F.3d at 357 (citing *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984)).

### 1. Medical Records predating the ALJ's July 12, 2011 decision

Sabo argues that remand is appropriate for consideration of medical records from SCC documenting treatment with Dr. Sargious and her counselor Bonnie Bennett dated 3/21/2008 to 4/06/2011.  Doc. 14, pp. 10-11; Tr. 427-484.  The records show that Sabo engaged in counseling with Ms. Bennett from April 2008 through April 2011.  Tr. 428-480.   The records also show additional visits to Dr. Sargious in 2010 and 2011.  The records from 2010 generally show that Sabo continued to report that she struggled with depression and anxiety.  Tr. 434, 436, 438, 440.

In March 2011, Sabo returned to Dr. Sargious. Tr 429. Dr. Sargious stated that Sabo did not submit to a drug screen the prior week as requested but insisted she needs her medication. Tr. 429. Dr. Sargious noted the Robinson Memorial records which show that Sabo was treated for lithium toxicity and that she tested positive for various substances. Id. Dr. Sargious stated,

> Discussed with her today that the medication we were giving her was a very serious drugs (sic) and we can't really afford her having drug problem with this medication. She kept insisting that she doesn't use drugs and that she needs her medication because she is crashing without it…Patient with Bipolar Disoder. Now problem with substance abuse including benzodiazapines, barbiturates and also marijuana. We are going to order a drug screen and we are going to refer her to also (sic) Glenbeigh for rehab.

Id.

Sabo argues that the hearing transcript demonstrates that additional medical records predating the June 22, 2011 hearing were intended to be submitted to the ALJ after the hearing. Tr. 45, 81. Sabo's counsel indicated to the ALJ at the hearing that he would be supplementing the record with some additional medical records. Tr. 81. The next day counsel submitted additional medical records from 2009 and 2010 (Tr. 366-373, Exhibit 17F). The ALJ clearly considered this evidence and specifically cited to Exhibit 17F when he rendered his decision on July 12, 2011. Tr. 36.

There was nothing to suggest to the ALJ that there were missing records at the time of the decision. The burden of providing a complete record rests on the claimant. *Foster*, 279 F.3d at 357 (6th Cir. 2001) (*citing Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir.1986)). Accordingly, as to the records produced after the ALJ's decision but predating it, Sabo fails to show good cause for her failure to acquire and present the evidence for inclusion in the hearing before the ALJ. *Id.* Because this Court concludes that Sabo has failed to satisfy the "good cause" requirement, we do not decide the question of whether the pre-hearing evidence constitutes new and material evidence.

14

### 2. Medical Records post-dating the ALJ's July 12, 2011, decision

Plaintiff presented various medical records to the Appeals Council which involved appointments and exams which took place *after* the ALJ's July 12, 2011, decision. Plaintiff points to the following evidence as new and material: (a) an October 7, 2011 letter from Dr. Zachary F. Veres (Tr. 408); (b) an October 17, 2011 "Counselor's Evaluation Impairment Questionnaire" from counselor Bennett (Tr. 393-400); (c) an October 12, 2011 letter from Dr. Sargious (Tr. 489); and (d) an October 14, 2011 nerve conduction study (Tr. 483-487) Doc. 14, p. 10.

Sabo offers no explanation as to why the medical evidence she seeks to have considered on remand could not have been acquired or presented to the ALJ in the June 22, 2011, hearing. "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Commissioner of Social Security*, 479 Fed. Appx. 713, 725 (6th Cir.2012). The Sixth Circuit "takes a harder line on the good cause test with respect to timing and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing." *Id., quoting Oliver v. Secretary of Health & Human Services,* 804 F.2d 964, 966 (6th Cir.1986) (internal quotations omitted).

To show good cause a claimant is required to detail the obstacles that prevented him from entering the evidence in a timely manner. *Bass v. McMahon, 499 F.3d 506, 513* (6th Cir.2007). Sabo fails to explain why the nerve conduction study could not have occurred prior to the hearing with the ALJ or why the opinion evidence could not have been obtained prior to the hearing. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'"). Absent a demonstration of good cause to excuse the failure to incorporate this evidence in the original hearing, we cannot order a remand for the purposes of requiring the Secretary to consider new evidence. *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). To do so would directly contravene the express language contained in the 1980 amendment to 42 U.S.C. § 405(g). *Id.*

Because we conclude that Sabo has failed to satisfy the "good cause" requirement, we do not decide the question of whether the post-hearing evidence constitutes new and material evidence.

### B. The ALJ appropriately assessed Sabo's credibility

Sabo also argues that the Commissioner did not appropriately assess her credibility. Doc. 14, p. 14. The ALJ found Sabo's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they are inconsistent with the RFC. Tr. 36. The Commissioner argues that the ALJ considered the necessary factors for evaluation of subjective complaints under Social Security Ruling 96-7p and that the ALJ's decision as a whole articulates the principal evidence upon which he relied to support the conclusion that Sabo remained capable for at least a range of simple, medium work.. Doc. 15, p. 14.

The ALJ's credibility determinations are entitled to great deference because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying. *Buxton v. Halter,* 246 F.3d 762 at 773; *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476; *Walters v.*

16

*Commissioner of Social Sec.,* 127 F.3d 525, 531. On appeal, a reviewing court is "limited to evaluating whether or not the ALJ's explanations for [discrediting the witness] are reasonable and supported by substantial evidence in the record." *Jones,* 336 F.3d at 476. In determining the credibility of the individual's statements, the ALJ must consider the following factors:

>    1. The individual's daily activities;
>
>    2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
>    3. Factors that precipitate and aggravate the symptoms;
>
>    4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
>    5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
>    6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>    7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P *3 (July 2, 1996).  One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. *Id.* at *4.

As to Sabo's daily activities, the ALJ stated that Sabo reported that she does not socialize, perform household chores, drive, groom daily, cook, shop, or go out in public. Tr. 37, 190-197 (Sabo's July 17, 2009, Functional Report).  According to the ALJ, Sabo is "essentially reporting that she is able to do nothing." Tr. 37.  The ALJ found this was not credible based on Sabo's "conservative treatment" and the "weak medical evidence." Tr. 37.  The ALJ also discussed Sabo's consultative exam (which took place just two months after her Functional

17

Report) where she stated her daily activities included: preparing simple meals, doing the laundry, cleaning, and raising her teenage son. Tr. 34, 297. Clearly the ALJ's decision shows an inconsistency between Sabo's testimony and what she reported previously with regard to her daily activities and that inconsistency supports the ALJ's credibility determination. SSR 97-7P *4.

The ALJ also found that the record does not establish that Sabo's symptoms are as severe as she stated. Tr. 36. The ALJ stated that Sabo's treatment has been "routine and conservative" and then summarized the last few years of treatment. Id. The ALJ recognized that Sabo regularly sees Dr. Sargious but stated that in 2008 Sabo was doing well and her medications were helping. Id. In fact, Sabo was able to drive again. Id. In 2009 and 2010, the ALJ recognized that Sabo reported a worsening of her symptoms but stated, with regard to severity, that she "never went to an emergency room or psychiatric hospital during 2009 and 2010 for her problems." Id. As for 2011, Sabo did not provide any records to the ALJ indicating any mental health treatment from her treating source that year.[6] Id. The only 2011 mental health treatment note is from February 24, 2011, when Sabo accidentally took the incorrect does of her Lithium and had to go to the emergency room for Lithium toxicity but at the time she denied any suicidal ideation. Tr. 36-37, 347. Taken as a whole, the ALJ did not find Sabo's treatment history supported the severity of the symptoms she testified to.

With regard to Sabo's physical symptoms, Sabo reported that she has trouble lifting, standing, walking, sitting, stair climbing, kneeling, squatting, reaching, seeing, hearing, and talking. Tr. 198. Sabo reported a twenty year history of back pain and a ten to fifteen year history of left knee pain. Tr. 37. The ALJ found that the evidence of record does not support the

---

[6] This court has rejected Sabo's request for a sentence six remand based on a claim of "new and material" evidence which included two 2011visits with Dr. Sargious (Tr. 430–February 16, 2011; Tr. 429–March 28, 2011) that were not before the ALJ. See discussion above.

18

severity of Sabo's alleged physical symptoms. Upon examination by Dr. Massullo, consultative examiner, Sabo had no heat, redness, thickening, or swelling of the joints. Tr. 37. Dr. Massullo also found that Sabo's gait and the range of motion in her spine was normal and she was not using any ambulatory devices. Tr. 37. In addition, October 28, 2010, diagnostic findings revealed degenerative disc disease in Sabo's lumbar spine but no evidence of fracture (as reported by Sabo) and the right and left knees were entirely normal. Tr. 37-38. The ALJ specifically pointed out that the diagnostic testing was inconsistent with Sabo's "testimony that she cannot even lift 10 pounds on a frequent basis, and cannot stand longer than 20 minutes at a time." Tr. 38.

Considering all of the above, the ALJ's review of Sabo's credibility was reasonable and supported by substantial evidence. In this case, the evidence in the record was conflicting and required the ALJ to make a credibility determination. Because the ALJ provided specific explanations for his credibility finding, and because his finding was within the zone of reasonable choices, his denial of Sabo's application for benefits must be affirmed. *See Buxton, 246 F.3d at 773*.

### VII. Conclusion

For the foregoing reasons, the undersigned **AFFIRMS** the decision of the Commissioner.

Dated: March 14, 2014

Kathleen B. Burke
United States Magistrate Judge

19